IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Criminal No: 4:22-cr-00580-JD |
| **vs.** | |
| **BHAGAVAN MAHAMAYAVI ANTLE,** **a/k/a KEVIN ANTLE,** **a/k/a DOC ANTLE,** | **GOVERNMENT'S SENTENCING** **MEMORANDUM** |

On November 6, 2023, the Defendant Bhagavan Mahamayavi Antle, a/k/a Kevin Antle, a/k/a Doc Antle (hereinafter "Defendant" and/or "Antle") pled guilty to Counts 1 and 2 of an Information pursuant to a written plea agreement. The United States submits this memorandum in advance of Defendant's sentencing. ████████████████████████████████

███████████████████████████████████████████████████████

The Government believes the Presentence Investigation Report ("PSR") properly calculated the guidelines. The Defendant has submitted objections to the PSR, some of which are still pending. As explained below the Government would respectfully ask this Court to overrule the Defendant's objections.

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

This case involves two serious offenses and, as set forth below, the Government believes that after weighing to § 3553(a) factors, a period of incarceration between 27 and 33 months is sufficient but not greater than necessary to accomplish the goals of sentencing.

---

## I.     BACKGROUND.

In June 2022, Antle was arrested pursuant to a Complaint and was subsequently indicted in a ten-count Indictment charging him various wildlife and money laundering related crimes.  *See* ECF Nos. 3 and 62.  On November 6, 2023, he pled guilty to a two-count Criminal Information. ECF No. 234.  The PSR details Antle's offense conduct very well, and the Government briefly summarizes here.  *See* PSR ¶¶ 31 – 122.

*Myrtle Beach Safari and Lacey Act Violations*

Antle was the owner and operator of The Institute for Greatly Endangered and Rare Species, also known as the Myrtle Beach Safari.  The Myrtle Beach Safari was a for-profit 50-acre wildlife tropical preserve that offered safari tours and private encounters with exotic wildlife. Antle was also the Director of the Rare Species Fund, a nonprofit organization registered in South Carolina.

Antle's Myrtle Beach Safari was very successful, and its success depended on the availability of exotic animals.  Operators like Antle placed a premium on baby animals that were not yet large enough to harm humans.  This need for a consistent supply of baby animals drove a thriving illegal market in endangered species throughout the United States and abroad.   Antle was on nearly every side of the market, both legal and illegal, as he bred animals, bought animals, and sold animals.  Antle's business was hindered because many of the most desirable species were protected by various domestic and international rules, such as the Endangered Species Act (ESA), the Lacey Act, and the Convention on International Trade in Species of Wild Fauna and Flora (CITES).  Since the most desirable animals were protected, Antle had to buy and sell protected animals such as lions, tigers, cheetahs, and chimpanzees illegally, and he had to do it in a way that law enforcement could not trace.

To stay in business and hide his activities, Antle falsified many years' worth of paperwork, required illegal payments be labeled "donations" funneled through his non-profit, and relied heavily on untraceable cash.  As he did so, business at the Myrtle Beach Safari boomed.  *See* PSR ¶¶ 182-184.

<em>Money Laundering Operation</em>

In March 2021, William Dallis[2] was discussing with a law enforcement confidential source (hereinafter referred to as "CS1") how he was actively engaged in laundering.  During this March 2021 conversation, Dallis discussed with CS1 that he had dealings with Antle.  One of the dealings Dallis mentioned to CS1 was Antle's need for cash in 2019 to buy a newborn chimpanzee.[3]

Based on this March 2021 conservation between Dallis and CS1, federal law enforcement began a reverse money laundering operation with Antle.  *See* PSR ¶ 117.  Between November and December 2021, Antle met with CS1 on at least two occasions at Myrtle Beach Safari and discussed CS1's need to wash large amounts of cash.  During these discussions, the washing fee Antle would charge was discussed and, further, Antle was informed by CS1 that the cash he needed washed was from the smuggling and harboring of illegal immigrants into the United States.  *See* PSR ¶ 117.  Below are excerpts from the November 2021 meeting between Antle and CS1:[4]

---

[2] Dallis was sentenced by this Court to one year and one day for his involvement in a similar reverse money laundering operation.  *See* Case No.: 4:22-cr-00579.

[3] The investigation into Antle revealed that in 2019 Antle needed $200,000 cash to illegally purchase a newborn chimpanzee. Dallis requested an individual that he had dealings with assist Antle with his need for cash.  The individual that was going to assist Antle was also a law enforcement source; however, it was a different source than CS1 who was involved in the reverse money laundering operation that is the basis for Antle's conviction in this case. This 2019 transaction never came to fruition.

[4] The Government would set forth for the Court that the recordings and/or transcripts of the recordings can be provided should the Court wish to hear the extensive back and forth between Antle and CS1 discussing the reverse money laundering activity.  Although Antle was not assessed a leadership enhancement for the money laundering activity, because it was applied for count one, what the recordings unequivocally establish is that Antle was not a minor, or passive, participant in the laundering operation.  *See* PSR ¶¶ 124-125.

CS1:    The reason I wanted to come talk to you and I wanted it to be private cuz I wanted to ask you something. I don't know if you remember, a long time ago you called me and you wanted to do the deal with the 200 grand.

Antle:   Yeah, yeah, sure.

CS1:    You remember that? But I couldn't do it, so I got you the [person] but didn't end up doing well too. But right now, right now I've got about $350,000 cash and I have another 300 coming, but it's cash and it's not drug money, so I don't give a shit. [Myrtle Beach Launderer] does it with me all the time.

Antle:   Yeah, yeah, Dallis told me.

CS1:    But I don't know if you want to do something? If you want to do something?

Antle:   Because you're ready to change some cash for check. I can write a check to . . . [your] company and it just goes in as though I bought [supplies from your company].

CS1:    Or if you have somebody that does that for you maybe you have some cash and you have somebody that gives you the check. I want to turn the money into my company, in my personal company. I have a personal company, like I have another company so I want to put the money cash into my company. I'm only asking cuz one time you asked me.

Antle:   I had a quick deal too. I had to get a monkey but the people won't take a check. They only take cash. So what do you do? You have to be able to get the cash to go do it, and it's hard to do.

CS1:    Dallis done it for me a couple times, but he can only do so much, you know?

Antle:   Yeah, of course it gets tight. And you are trying to do it with regularity?

CS1:    I'm trying to do it quick.

Antle:   Yeah, Yeah, exactly. But roughly, I probably don't need 300k right now. But maybe I got to check with the stuff. I mean I know, the nice thing would be then I can write the check.

CS1:    To the company.

Antle:   To the company or to you personally? It can go to the company.

CS1:    No, to the company.

Antle:   It goes to the company. So then it looks good like I'm buying lots more [supplies from your company] and so it's also tax deductible at the same time.

CS1:    Yeah, that's what I did with Dallis.

…

CS1:    That why I didn't want to talk on the phone, you know.

Antle:   No, of course not, never. No text. Text is the worse. Now, when I got in trouble before is because they walked up and said we think you're being a bad guy. Let me see your phone. And they took my phone.

CS1:    Yeah.

4

Antle:    Yeah and they have your phone. And they download your phone and they have your text. That's why text is the most dangerous. Because to tap your telephone, to listen to your phone calls is very difficult. That's a very very difficult umm…

CS1:    I still didn't want to tell you on the phone.

Antle:    No, you shouldn't. But I'm just saying, it's never as dangerous but text is fucking easy for them to take from you. They can't take your phone calls because they are not recorded. And for them to get a warrant to listen to your phone is almost impossible. It's just not done in America very much. They just don't listen to phones.

CS1:    Ohhh Ok

Antle:    You got to be a major drug dealer or a terrorist they are going to fuck you. If you are a terrorist they are going to listen to your phone somehow then all the rules are off if you are Al Queda.

Antle:    If I got a friend that will do it... You got 600k right now that you want to swap?

CS1:    Yeah, I got 350 now and I'll have about 300 later.

Antle:    So, 650 almost. That guy does deals for business. If he wants to take that from you and give you money for it, you gonna give him something for it? If there is any way if he says I'll take it but I want 10%? I want 20%? What is reasonable?

CS1:    Oh yeah, of course.

Antle    I know he is going to ask. If I ask him, he is going to ask.

CS1:    What do you think is reasonable? Like 5%?

Antle:    I know guys previously that were doing stuff like that where they are helping guys that are having to sell oranges. Guys that are in the massive orange market. And they got tons of guys working for the orange market that they have to pay in cash. And they have to hide the cash because you'll get investigated for how many employees you have and how many people are there. So when they want to pay everyone in cash they want to switch it back. Those guys were paying 25% to exchange cash for checks to have enough cash to pay people. That's the last guys I know that were doing that. That's a lot of money. That's a couple hundred grand. That's a million dollars.

CS1:    Yeah, when I came to ask you that, of course I know there's gonna be something. When I do it with Dallis, he charges me I think it's 7%. So of course, I don't want the guy to give a 600 thousand check and I give him 600,000, he needs to make some money. That's the business.

Antle:    Right, Right. Of course, cuz he's a pro at it too. That guy. The Orange….

CS1:    Yes, that's the business. Everybody has to make something. I'm making having the cash so he needs to make something.

Antle:    Of course. So what do you want me to tell him?

CS1:    Between 10 and 7. I mean between 5 – 7 %. And see what he says.

Antle:    5 and 7. Something like that? I can ask him. I can just see. You never know. And he'll do it, it won't be a problem.

As stated in the PSR, between February 2022 and April 2022, Antle and his Co-Defendant Andrew Sawyer[5] washed $505,000.00 in cash for CS1. *See* PSR ¶ 122. Antle and Sawyer charged a 15% washing fee for the transactions and, as a result, profited $75,750. *See* PSR ¶¶ 118-120.

## II.    OBJECTIONS TO THE PRESENTENCE REPORT.[6]

The Defendant has raised several objections to the PSR, many of which would substantively affect the total offense level. As set forth initially in this sentencing memorandum, the Government believes the total offense level has been properly calculated and would respectfully respect the Court overrule the Defendant's remaining objections.[7]

### A.    The Proper Calculation of the Wildlife's Market Value is $750,500 (Objection No. 1).

The PSR correctly calculated the market value of illegal wildlife in this case as $750,500. PSR ¶ 139. Although wildlife other than the three chimpanzees account for $150,500 of the total market value, Antle focuses his objection on the three chimpanzee transactions.[8] As will be discussed below, and also set forth in the Revised Addendum to the PSR dated May 29, 2024

---

[5] Andrew Sawyer was sentenced on June 10, 2025.

[6] The Government will address each of the Defendant's objections that would substantively affect the guidelines in this memorandum; however, it would also refer the Court to the Revised Addendum to the PSR because the USPO does an excellent and thorough job of responding to each of the Defendant's objections. Further, Antle has a handful of objections that do not affect his guideline range, and the Government would set forth that, pursuant to Rule 32, a ruling is not necessary.

[7] Through discussions with counsel and the USPO, the following objections to the PSR were resolved: (1) Antle's objection to paragraphs 55-61 and 121, which included a transaction involving a warthog and two lemurs as relevant conduct; and (2) Antle's objections to paragraphs 99 and 121, which included a transaction involving three juvenile hyenas as relevant conduct.

[8] Since Antle has primarily focused on the market value determination for the three chimpanzees in his objection, the Government has, also, focused its response to Antle's objection on the market value of the chimpanzees. That said, the reasoning applies equally to Antle's proposed revisions to paragraphs 121 and 139 of the PSR as it relates to the other wildlife. *See* Addendum to PSR pp. 10-11.

("Addendum to PSR"), Antle's arguments are unpersuasive based on a plain reading of the Guidelines and well-established precedent.

Guideline 2Q2.1(b)(3)(A)(ii) directs the Court to increase the offense level based on the "market value" of the wildlife involved and the table contained in U.S.S.G § 2B1.1. Application Note 4 sets forth a two-step analysis for determining the market value. U.S.S.G § 2Q2.1 App. N. 4. First, if information is reasonably available, the market value is the fair-market retail price and the Court should use that price, ending the inquiry. *See* U.S.S.G § 2Q2.1 App. N. 4. Application Note 4 then provides that "if the fair-market retail price is difficult to ascertain, the court may make a reasonable estimate using any reliable information, such as the reasonable replacement or restitution cost or the acquisition and preservation (*e.g.*, taxidermy) cost." *Id.* Importantly, step two is not reached if the market value is "reasonably available." *United States v. Butler*, 694 F.3d 1177, 1181 (10th Cir. 2012) ("In other words, a district court must make a factual determination that the fair-market retail price is not readily available before resorting to estimation of the animal's value.").

As explained below, the Government believes this Court need not go past the first step in determining the market value of the three chimpanzees; however, if this Court does reach the second step, the Government would set forth that the Court will still reach the conclusion that the market value is $200,000 a chimpanzee. It is also worth noting that Antle's Co-Defendant Jason Clay was recently sentenced by this Court. *See* ECF No. 334. Clay initially objected to the market value but withdrew his objection at sentencing. Based on Clay's withdrawal, this Court relied on a market value of $200,000 for the chimpanzee Clay sold to Antle and sentenced Clay accordingly.

      i.   <u>The fair-market retail price of a chimpanzee is reasonably available.</u>

As Application Note 4 to U.S.S.G § 2Q2.1 states, if information is reasonably available, the market value is the fair-market retail price and the Court should use that price, ending the inquiry.  *See Butler*, 694 F.3d at 1181.  The Supreme Court has further clarified market value, finding that it is "'what a willing buyer would pay in cash to a willing seller' at the time." *United States v.  564.54 Acres of Land*, 441 U.S. 506, 511 (1979) (quoting *United States v. Miller*, 317 U.S.  369, 374 (1943)), *see also United States v. Cartwright*, 411 U.S. 546, 551 (1973) (endorsing the "willing buyer-willing seller test" to determine fair market value).   In cases involving wildlife, the Fourth Circuit has uniformly used the price paid, or offered, for illegal animals as the market value.  *See, e.g.*, *United States v. Dove*, 247 F.3d. 152, 159 (4th Cir. 2001) (finding that the average black market price was the proper valuation for sale of illegal bear gall bladders); *United States v. Clark*, 986 F.2d 65, 70 (4th Cir. 1993) (ruling that the defendant's statements regarding his expected sale price of tiger skin rug were sufficient to establish market value); *United States v. Borden*, 10 F.3d 1058, 1063 (4th Cir. 1993) (finding that the actual sale price of illegal mussels was the proper market value).   In *Dove*, the Fourth Circuit relied on *United States v. Eyoum*, in which the Seventh Circuit stated the fair-market value of illegal wildlife should be *at least* the value paid by the Defendant – that "the price the crook received may be a floor at sentencing, but it is not a ceiling." 84 F.3d 1004, 1008 (7th Cir. 1996).

Here, Antle's claim that "there is no market for endangered species" is meritless.  As the USPO correctly points on in its Addendum to the PSR, determining the fair-market value in "this case is a straightforward exercise," and the Court need not go any further than the basic facts of the case.  Antle argues that the Court should not use the price Antle paid for endangered species because, counterfactually, there is no market for endangered species and therefore no market value.  By making this argument, Antle ignores his own actions, statements, and text messages.

Moreover, common sense establishes that there is a market for endangered species. The PSR lists fifteen of Antle's illegal transactions in endangered species involving at least twelve different buyers or sellers. PSR at ¶¶ 38-104. Antle's phone was full of texts and emails negotiating the price, quality, and transportation of endangered species. What the evidence here establishes is that not only is there a market, but Antle is, arguably, the largest player in purchasing illegal wildlife and setting the fair-market price for these illegally trafficked animals.

Rather than saying there is no market for endangered species, Antle would have been more accurate to state that the market for endangered species is small, specialized, and illegal. The Fourth Circuit has endorsed the illegal market as the relevant market if that is where the Defendant was operating. *See Dove*, 247 F.3d at 159. Baby chimpanzees, in particular, are extremely rare and valuable, and only a small subset of people have the money to buy one, the experience to care for one, *and* the facilities to profit off of one. Baby chimps are undeniably profitable, which validates the high purchase price. As advertised on Myrtle Beach Safari's website, a 3-5 minute "encounter" with a young chimp at Antle's facility starts at $200 per person.[9] Prior to being indicted, Antle had a second location in North Myrtle Beach's Barefoot Landing that solely sold photo encounters with baby animals for $200 per person.[10] At that rate, a baby chimpanzee could easily recoup its $200,000 purchase price within a month without even considering the value of social media photos and videos. Antle's associated social media accounts, which have more than 10 million followers, are full of photos and videos of the chimpanzees, generating yet another substantial income stream.[11]

---

[9] https://www.docantlespreservationstation.com/
[10] https://www.tripadvisor.com/Attraction Review-g54371-d1099016-Reviews-T_I_G_E_R_S_Preservation_Station-North_Myrtle_Beach_South_Carolina.html
[11] Co-Defendant Moksha Bybee stated that all of her social media income, which was substantial, went directly to Antle without her even knowing the amounts.

The undisputed evidence is that in three different arm's-length transactions, negotiated with three different sellers, Antle paid $200,000 each for a newborn chimpanzee. That is not just the value that a "willing buyer would pay to a willing seller," it is the price that a willing buyer *did* pay to willing sellers. In fact, one of those sellers confirmed that "the going rate for an infant chimpanzee was $200,000." Further, Andrew Sawyer, one of Antle's Co-Defendants, also stated that Antle told him chimpanzees were going for $200,000, which made sense to Sawyer because chimpanzees are expensive, rare, and are the "Rolls Royce" of primates. *See* PSR at ¶¶ 105-110.

Despite the vast potential for profit, the market remains small and specialized. Chimpanzees are dangerous, highly intelligent, require specialized social structures, live more than 60 years, and are difficult to breed. As captive chimpanzees were phased out of use in Hollywood, the breeding market shrunk considerably.[12] In fact, Sunshine Zoological Preserve in North Florida, which bred all three of Antle's illegal chimps, was the only known breeder in the United States that provides newborn chimpanzees to non-scientific institutions. In such a small, illegal, specialized market, where the profit potential is immense and supply is limited, the fair market value is what a buyer has paid on that open market, legal or illegal, as the Fourth Circuit has repeatedly held. *See, e.g.*, *Dove*, 247 F.3d. at 159; *Clark*, 986 F.2d at 70; *Borden*, 10 F.3d at 1063. As a result, the Government would respectfully set forth that the preponderance of the evidence makes clear that the fair-market value of a chimpanzee is $200,000 and would ask this Court to overrule Antle's objection.

        ii.    <u>Antle's reliance on collateral forfeiture tables to determine market value is misplaced.</u>

---

[12] *See, e.g.*, Mitch Caudill*, Protecting Chimpanzees from Hollywood and Extinction*, The Pulitzer Center, https://pulitzercenter.org/education/protecting-chimpanzees-hollywood-and-extinction (Feb. 25, 2012); Arcus Foundation, *Animals in Entertainment: A Hollywood Ending?,* https://www.arcusfoundation.org/blog/story-of-impact/animals-in-entertainment-a-hollywood-ending (Sept. 12, 2016).

Antle asks this Court to ignore the actual price Antle paid for *three* chimpanzees, find that the fair-market retail price is difficult to ascertain, and rely on fine amounts contained in a collateral forfeiture schedule to determine the fair-market value. Ignoring Fourth Circuit precedent, in support of his argument, Antle relies on *United States v. Bertucci*, an Eighth Circuit case in which Defendant Bertucci pled guilty to killing two birds for non-commercial purposes. 794 F.3d 925 (8th Cir. 2015); *but see Dove*, 247 F.3d. at 159; *Clark*, 986 F.2d at 70; *Borden*, 10 F.3d at 1063. The Eighth Circuit in *Bertucci* relied on the collateral forfeiture schedule when determining the fair-market value under U.S.S.G § 2Q2.1. Although the Government believes the use of forfeiture tables in *Bertucci* was wrongly decided, it is distinguishable from the present case because, in *Bertucci*, there was no sale of an animal. As a result, the Court in *Bertucci* could not rely on the price actually paid for the birds. *Id*.

Antle also cites the transcript from *United States v. Sheldon Tree Top*, D. SD Case No. 3:17-cr-30116, and provides selective quotes to suggest that the Judge relied solely on the forfeiture tables. *See* Addendum to PSR pp. 3-4. The reality is that the issue of determining fair-market value in *Tree Top* was far more nuanced than Antle would have this Court believe. The court in *Tree Top* found that the value of an immature eagle was difficult to ascertain from the sale and barter of four feathers so it went to the second-step of Application Note 4 to U.S.S.G § 2Q2.1.[13] In the end, the Judge in *Tree Top* noted that he was bound by Eighth Circuit precedent in *Bertucci*, yet he also found that the Government expert's estimates came to the same value as the forfeiture

---

[13]The court in *Tree Top* had to estimate the value of a hypothetical immature bald eagle carcass based on the sale and barter of four feathers. The market for eagle feathers is conducted through a federally run non-profit religious liberty program managed by the USFWS in Denver, Colorado. Thus, to estimate the value of an eagle carcass, the court relied on expert evaluation of ecological monitoring costs, replacement costs of mature versus immature eagles, differences in state markets, and differences in the price of the feathers involved in the case. The court also noted that with thirty pending cases, efficiency was more important than in a typical matter.

tables.  Over the defendant's objection, the *Tree Top* court used that same common value – the Government's expert and the collateral forfeiture table – as the fair-market value.

Here, unlike in *Tree Top* where the court could not easily ascertain the fair-market value of an eagle, the Court knows the actual purchase price of Antle's chimpanzees.  The price of Antle's chimpanzees is corroborated by statements from others in the same industry (i.e.: the illegal buying and selling of endangered species).[14]  Further, the Fourth Circuit, unlike the Eighth Circuit, has uniformly used the price paid, or offered, for illegal animals as the market value.  *See, e.g.*, *Dove*, 247 F.3d. at 159; *Clark*, 986 F.2d at 70; *Borden*, 10 F.3d at 1063.

Even if the Court agrees with Antle that the fair-market value is difficult to ascertain, and Antle's purchase price is not the fair-market retail price, collateral forfeiture tables are not a "reasonable estimate."  *See* U.S.S.G § 2Q2.1 App. N. 4.  In fact, they are not estimates at all – they allow a court to "accept a fixed-sum payment in lieu of the defendant's appearance and end the case" in certain petty offenses and misdemeanors. D. SC ECF No. 3:07-mc-05018-CIV.

One look at the forfeiture tables referenced by the Defendant shows that there is no correlation to the market value of a chimpanzee.  For example, all CITES-I species, which includes chimpanzees, rhinoceros, and vaquitas, are listed as $1,000 + $50 per specimen.  *Id*. at Entry No. 1-2 p. 22.  Yet, the market value of a single rhino horn is well known, as shown by rulings from courts throughout the United States.  A single rhino horn sells for a minimum of $20,000 per pound and can sell for more than $300,000 per pound for finished goods.  *See, e.g.*, *United States v. Hess*, 829 F.3d 700, 703 (note that this case was decided by the Eighth Circuit after *Bertucci*); *United States v. Levine*, 743 Fed. Appx. 154, 155 (9th Cir. 2018).  The vaquita (*Phoecoena sinus)* is the

---

[14] The other parties in the transactions, Jason Clay and Shaylynn Kolwyck-Peterson, both stated that the $200,000 was the rate for a baby chimpanzee. Andrew Sawyer, Antle's primate keeper, also understood that the price was $200,000 and stated the price made sense to him.

smallest porpoise in the world and is virtually priceless because it is estimated that fewer than ten remain in the wild. If this Court were to accept the Defendant's argument and use the collateral forfeiture tables to determine fair-market value, a person could sell a five-pound rhino horn or capture and sell a vaquita and be held accountable (for guideline loss calculation purposes) for just $1,050. Using $1,050 to value all CITES-I animals is not reasonable; as such, even if this Court were to find that the fair-market value was not "reasonably attainable," using the collateral forfeiture table figures is not a "reasonable estimate."

### iii. Antle's claim that he purchased the baby chimpanzees to save their lives is immaterial and unsupported.

Antle's final argument is that his purchase price of $200,000 for each newborn chimpanzee is not the "market value" because he was buying the chimpanzees to save the animals. Even accepting that claim, his reasons for paying $200,000 are immaterial. As the Supreme Court has emphasized, the test for fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *Cartwright*, 411 U.S. at 551.

As an initial matter, there is scientific consensus that raising a baby chimpanzee among humans and allowing interaction with guests is severely detrimental to the chimpanzee's long-term wellbeing. Apes raised by humans show deficits in communication, learning, social awareness, sexual behavior, and maternal behavior.[15] In addition, throughout the apes' lives, they show a

---

[15] *E.g.*, William Scott Gilmer & William T. McKinney, *Early Experience and Depressive Disorders: Human and Nonhuman Primate Studies*, Journal of Affective Disorders, 75, 97-113 (2003); Sadie Jane Ryan, et al., *Effects of Hand-rearing on the Reproductive Success of Western Lowland Gorillas in North America. Zoo Biology,* 21(4), 389-401 (2002); Benjamin B. Beck & Michael L. Power, *Correlates of Sexual and Maternal Competence in Captive Gorillas*. Zoo Biology, 7, 339-350 (1988); Alan J. Beauchamp & John P. Gluck*, Associative Processes in Differentially Reared Monkeys: Sensory Preconditioning,* Developmental Psychobiology*,* 21, 355-364 (1988).

higher risk of immune diseases, depressive disorders, and abnormal function of the hypothalamic-pituitary-adrenal system.[16]   Human-reared apes also exhibit abnormal psychological behaviors such as repetitive rocking, pulling out their own hair, and self-injury.[17]   Chimps who have been raised by humans, but later integrated into chimpanzee-only social groups, have revealed further impacts of human-rearing.   The human-reared chimps had higher levels of cortisol (stress) hormones, were less calm, more fearful, and more vulnerable throughout their lives.[18]   The chimps raised without a chimpanzee mother had significant differences in their brain morphology, showing less global white-to-gray matter and less cortical folding.[19]   Human-reared chimps also showed less ability to engage in necessary social behavior, such as grooming.[20]   This is all in addition to the heightened risk of zoonotic disease transmission between humans and chimps, which is the basis of the Centers for Disease Control and Prevention and the National Association

---

[16] *E.g.*, Francesca Cirulli, et al., *Early Life Stress as a Risk Factor for Mental Health: Role of Neurotrophins from Rodents to Non-human Primates.* Neuroscience & Biobehavioral Reviews*, 33*(4), 573-585 (2009); M.H. Lewis, et al., *Early Social Deprivation in Nonhuman Primates: Long-term Effects on Survival and Cell-mediated Immunity*, Biological Psychiatry, 47, 119-126 (2000); Melinda Novak, et al., *Stress, the HPA Axis, and Nonhuman Primate Well-being: A Review*, Applied Animal Behaviour Science, 143(2-4), 135-149 (2013).

[17] J. Fritz, et al., *Abnormal Behaviors, With a Special Focus on Rocking, and Reproductive Competence in a Large Sample of Captive Chimpanzees (*Pan troglodytes*)*, American Journal of Primatology, 27(3), 161-176 (1992); Avanti Mallapur & B.C. Choudhury, *Behavioral Abnormalities in Captive Nonhuman Primates*, Journal of Applied Animal Welfare Science, 6, 275-284 (2003); Leanne T. Nash, et al., *Variables Influencing the Origins of Diverse Abnormal Behaviors in a Large Sample of Captive Chimpanzees* (Pan troglodytes), American Journal of Primatology, 48(1), 15-29 (1999); J. E. Martin, *Early Life Experiences: Activity Levels and Abnormal Behaviours in Resocialised Chimpanzees*, *Animal Welfare, 11(*4), 419-436 (2002).

[18] Sarah L. Jacobsen, et al., *Characterizing Abnormal Behavior in a Large Population of Zoo-Housed Chimpanzees: Prevalence and Potential Influencing Factors*, PeerJ, 4, e2225 (2016); Andrea W. Clay, *Attachment and Early Rearing: Longitudinal Effects in Chimpanzees (*Pan troglodytes*)*, Ph.D. Dissertation, Georgia Tech University (2012).

[19] Stephanie L. Bogart, et al., *Different Early Rearing Experiences Have Long-term Effects on Cortical Organization in Captive Chimpanzees* (Pan troglodytes), Developmental Science, *17*(2), 161-74 (2014).

[20] Hani D. Freeman & Stephen R. Ross, *The Impact of Atypical Early Histories on Pet or Performer Chimpanzees*, PeerJ, 2, e579 (2014).

of State Public Health Veterinarians' recommendation that non-human primates be excluded from public contact settings.[21] Though Antle may care for his chimps, the fact is that no baby chimpanzee raised by humans and regularly interacting with the public is in a better state of health than a baby chimpanzee raised by its mother or in a chimpanzee-only peer group.

Even if the scientific research was ignored, there is no evidence supporting Antle's claims of altruism. The overwhelming evidence is that Antle's chimpanzees were purchased for commercial purposes. ███████████████ all of his chimpanzees are part of public interactions. ███████ The adults, which are too dangerous to interact directly, will paint for guests on private tours and play volleyball with them from a distance. The young chimps, like the young lion and tiger cubs, are able to interact directly with guests. ███████████ ████████████████████ ████████████████████████ ██████████████████████████████ █████████████ The babies and juveniles were the most profitable, as guests can take photos and interact with them for an extra $200 each.

In 2016, Antle told a friend that he had just stopped direct contact between his then-youngest chimp because the chimpanzee was too big. In the text message, Antle went on to say that he wished juvenile chimpanzee interactions with guests "lasted longer like orangutans . . we got 7+ years out of orangutans, 4 out of chimp."[22] As soon as he no longer had a juvenile chimpanzee that could interact with guests, he started working his contacts to buy another. Antle first texted a Texas-based small monkey dealer and stated, "I really need the very tall order of a

---

[21] National Association of State Public Health Veterinarians, Inc. (2011). Compendium of measures to prevent disease associated with animals in public settings. *Centers for Disease Control and Prevention Morbidity and Mortality Weekly Report, 60*(4), 1-24.

[22] The text messages herein were obtained from Antle's phone pursuant to a search warrant and have been provided to the Defendant in discovery. If the Court wishes to view the messages, the Government can provide them to chambers.

chimp or orangutan baby . . . 50k to 100k for a baby ape if we have to." Antle failed to get a baby ape that year, and in 2017, Antle texted a friend that "I need a baby chimp if u run across any – I will give you $10k on top of chimp price."

In May 2019, a friend texted Antle that a baby chimp may be born soon. Antle replied "What? Who? Danny? Price?!?" The friend confirmed that Danny Kolwyck at Sunshine Zoological was the seller, and Antle texted "I want." This Court is familiar with this transaction because it involved Antle's Co-Defendant, Jason Clay, who has been previously sentenced by this Court and another Defendant who has a case pending in front of this Court, Shaylynn Kolwyck. In 2019, because of an unrelated issue between Danny Kolwyck and Antle, Antle could not buy the baby chimpanzee directly from Sunshine Zoological, and it was provided to Co-Defendant Jason Clay as a temporary loan for $100,000. Once the baby chimp went to Clay, Antle told a different person that "I would sure like another real [chimpanzee]. If you ever hear of a baby grab it I'll pay whatever for it." That person agreed to be the fence for Antle and told Sunshine Zoological that she wanted a baby chimpanzee. Sunshine Zoological told her she was "third in line" for the next baby. She then told Antle that she believed Danny would sell to the highest bidder, to which Antle responded "I will bid as high as is necessary within reason."

Not to be deterred, Antle then texted Co-Defendant Clay and stated, "I got what ever u need for the hairy kid if you decide to let him go." Clay responded that "it would be a lot lol," and Antle replied "I was thinking that a wonderful baby gibbon girl and a [big bag of cash] will make the chimp coming to visit me much easier." Clay later recalled that Antle was "relentless" in trying to procure the chimp and that they negotiated extensively, eventually settling on $200,000 and a gibbon in October 2019.

At no point, in any text messages between Antle, Clay, or others at the facility, did Antle express his desire to buy the chimpanzees to "save" them.  To the contrary, the day that Antle's 2019 baby chimpanzee from Clay arrived, he texted a picture of Moksha Bybee smiling and holding the baby to a fellow chimp-owner.  That owner texted "Probably paid a mint," and the two continued to text about similarities between their animals.  There was no discussion of health issues or any need to "save" the chimp.  Antle also texted the same picture to his family and staff, to which he received responses such as "HES AMAZING" and "I'm crying he's so freaking beautiful."  Again, there was no mention of health issues or the need to save the chimp's life.

After the 2019 transaction, Antle then negotiated two more chimpanzee purchases from Sunshine Zoological for $200,000, one in 2020 and one in 2022, arranging the first before the chimpanzee was born.  The operator of Sunshine Zoological stated that the chimpanzees were valuable enough that they were sometimes purchased before the mother was even pregnant.

The evidence is that baby chimpanzees were a rare, desirable, and valuable commodity within the captive animal world.  Each baby chimpanzee would be sold to someone, and Antle was determined that it would be him.  Antle aggressively sought baby chimpanzees out, offered finders fees, raised his purchase price, tried to use a straw buyer, and eventually negotiated a price for animals he so desired through arm's-length transactions.  The price he negotiated is the fair-market value and the price for which he should be held accountable.  *See, e.g.*, *Dove*, 247 F.3d. at 159; *Clark*, 986 F.2d at 70; *Borden*, 10 F.3d at 1063

    iv.    <u>The preponderance of the evidence unequivocally establishes that the fair-market value is reasonably available, and, even if it were difficult to ascertain, the reasonable estimate would be $200,000.</u>

Although the Government does not believe this Court needs to reach the second step of the market-value inquiry of U.S.S.G § 2Q2.1 App. N. 4, even if it did, the reliable information would

lead this Court to the conclusion that the fair-market value is $200,000. Antle conducted three arm's-length transactions at that price; three other witnesses have stated $200,000 was the price for a baby chimpanzee; the temporary possession of a baby chimpanzee cost $100,000; the animal would easily generate more $200,000 in a short time period; and baby chimpanzees are exceedingly rare and valuable.

In sum, Antle's objection to loss amount asks this Court to ignore the uncontroverted facts of his transactions, the plain text of the guideline, and well-established case law. Even if the Court does decide to move to step two of the market value analysis, the reliable information in front of the Court still points to the same value. Thus, the Government respectfully would ask this Court to overrule Antle's objection to loss amount.

### B.    The Application of a Leadership Enhancement is Correct (Objection No. 5).

The USPO applied a two-level enhancement for Antle's leadership role in Count One pursuant to U.S.S.G § 3B1.1(c). *See* PSR ¶¶ 124-125. Antle objects, claiming that he was not a leader in the crimes. The USPO properly rejected Antle's argument based on the facts and the law. *See* Addendum to PSR pp. 13-14.

The Guidelines apply a two-level enhancement if a defendant was an "organizer, leader, manager, or supervisor" of one or more participants. U.S.S.G § 3B1.1(C); *Id.* App. N. 2. In determining whether a defendant fits criteria, courts are directed to evaluate the level of the defendant's decision-making authority, degree of participation and planning, recruitment of accomplices, share of the profits, and control exhibited over others. *Id.* App. N. 4, *United States v. Agyekum*, 846 F.3d 744, 752 (4th Cir. 2017).

Antle's objections claim that he was not a leader and did not exhibit the requisite control for the enhancement to apply. As noted in the Addendum to the PSR, the facts here show that

Antle was in total control of the illegal transactions, organized all aspects of the transactions, and directed others in the crimes' commission. *See* Addendum to PSR pp. 13-14. Antle was the decision maker as to the price and number of animals, the time and date of deliveries, the method of payment, and, through his own testimony and admissions, he organized the false paperwork. Though there are numerous examples of his leadership, it may be useful to highlight Antle's role in one discrete illegal transaction.

In September 2018, via text message, Antle directly negotiated the illegal purchase of two juvenile cheetahs from a breeder in Florida for $35,000. Antle then arranged a date for his acquisition of the cheetahs with the breeder. When the breeder asked which state to use on documentation, Antle replied "FL for paperwork," which was false. Next, Antle texted Co-Defendant Moksha Bybee to tell her she would be picking up the cheetahs and told another employee to accompany Bybee. Antle then provided an envelope full of cash to Bybee who informed law enforcement that she never opened the envelope, had no idea how much was in it, and did not know the purchase price of the cheetahs.[23] Antle provided Bybee with the breeder's address, then texted the breeder to advise her what time and date Bybee and her co-worker would arrive. Antle told Bybee via text to ask the breeder to put his Miami address on any paperwork for the cheetahs. Antle was in communication with Bybee and her co-worker and knew their whereabouts, so he texted the breeder to let her know when Bybee was close to the facility. Further, Antle, for at least the second time, provided the breeder with his Florida facility information for paperwork, although the cheetahs were being driven immediately back to South Carolina. The breeder provided Bybee with sale paperwork, and Bybee texted Antle to ask if she

---

[23] Two days prior, Antle wrote two checks drawn from his non-profit's account: one to the employee that accompanied Bybee, and one to his daughter. Both checks had "cheetahs" in the memo line, and both were cashed. *See* PSR ¶ 71.

should sign.  Antle gave her permission to sign the transfer paperwork, though she did not.  The second employee then texted Antle a photo of the transfer paperwork, and Antle communicated with the breeder about details of the form.  From start to finish of the transaction, Antle controlled every aspect of a crime and directed two others in its commission.[24]  As determined by the USPO, these actions, and others, support the two-point enhancement for Antle's leadership role in this case, and the Government would respectfully ask this Court to overrule the Defendant's objection.

### C.    The USPO's Application of a Two-point Enhancement for a Conviction Pursuant to 18 U.S.C. § 1956 is Appropriate (Objection No. 6).

In the PSR, the USPO applied a two-level enhancement based on Antle's conviction under 18 U.S.C. § 1956.  *See* PSR ¶ 145.  Antle objects to this enhancement based on the premise that he was not convicted under § 1956 and, instead, he was convicted pursuant to 18 U.S.C. § 371.[25]

As the USPO correctly points out in its response to Antle's objection, Antle ignores the definition of "conviction" for the purpose of applying the two-level enhancement.  While Antle did plead guilty to a § 371, the object of his §371 conviction *was* § 1956, which makes the enhancement an appropriate enhancement because a "conviction for conspiracy to commit a violation of a specific statute is the functional equivalent of a conviction for a violation of that statute."  *See* Addendum to PSR.

Antle's objection relies on an unpublished Eastern District of Virginia; however, the USPO has cited a published Third Circuit case, which directly contradicts Antle's argument.  *See United*

---

[24] Bybee expanded on Antle's control over the facility and his employees' actions.  Bybee stated that she was never allowed to have her own financial accounts.  She did not receive a salary.  Antle paid for her expenses and paid her taxes.  The income she generated from social media also went to Antle, and until she temporarily left the facility, she was unaware of the amount she was making from social media.

[25] The Government would bring to the Court's attention that Antle's Co-Defendant Andrew Sawyer who has already been sentenced also received this same two-point enhancement, did not object to it, and was sentenced based on guidelines that included the two-point enhancement.  *See* Andrew Sawyer PSR, ¶ 39.

*States v. Ugoh*, 537 F. App'x 126, 129-30 (3d Cir. 2013) ("It is of no significance that, for the purposes of an entry judgement, the defendants were technically convicted of conspiracy pursuant to 18 U.S.C. § 371.").

Based on the clear reading of U.S.S.G. § 2S1.1(b)(2)(B), the U.S.S.G. application notes, and consistent with the only published case addressing this issue, the Government respectfully asks this Court to overrule Antle's objection to the two-point enhancement.

## III.     THE GOVERNMENT BELIEVES THAT AN EVALUATION OF THE STANDARDS SET FORTH IN 18 U.S.C. § 3553(a) WARRANTS A SENTENCE WITHIN THE ADVISORY GUIDELINES RANGE.

The sentencing statute, 18 U.S.C. § 3553(a), requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[26] The Advisory sentencing guidelines "should be the starting point and the initial benchmark" in determining the appropriate sentence. *See Gall v. United States*, 522 U.S. 38 (2007). To determine the "particular" sentence to impose, the Court must consider the statutory factors listed in §3553(a)(1)-(7). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

### A.     Nature of Offense and History and Characteristics of Defendant – §3553(a)(1).

At the outset, the Government recognizes that Antle does not have a significant criminal history ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮▮

---

[26] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(A)-(D).

▓▓ .  Notwithstanding ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, he committed multiple serious offenses, which warrants a meaningful custodial sentence.

        i.        <u>Lacey Act Conduct.</u>

Antle has made an extremely lucrative career in selling experiences with endangered and protected animals.  For example, at Myrtle Beach Safari, for $200 per person, Antle will provide the opportunity to interact and take photos with a juvenile chimpanzee and lion cubs for 3-5 minutes.  Starting at $389, one person can join a group tour of his facility.  For $7,000, two people can paint with chimpanzees or swim with an elephant.  By most accounts, the guests of Myrtle Beach Safari enjoy their experiences.  Yet behind all these lucrative experiences, is a business that thrives on the illegal trade in endangered wildlife throughout the country. [27]  While the public face of the Myrtle Beach Safari was one of animal conservation and care, the reality was animal exploitation for profit.

At Antle's property, tamed wild animals are the centerpiece.  Lions, tigers, ligers, wolves, chimpanzees, lemurs and many other exotic species are on display as part of an organized show.  Antle has convinced himself and his employees that he is not harming these animals, but this is contrary to all published science and literature.  Antle was constantly looking for juvenile endangered animals, and would falsify paperwork and break the law in his acquisition of them, because he knew it was lucrative.  Antle told a friend over text that an additional tiger cub would make him "$50-$100k" in pictures.  In 2019, while negotiating the price of tiger cubs, Antle told another individual over text "I'm not trying to hold you up, I need babies desperately just like you."  This was even more evident in Antle's desire for baby chimpanzees.  He offered a $10,000 finder's fee, arranged for purchases before the animals were even born, and paid $200,000 per

---

[27] *See e.g.*,  https://www.nationalgeographic.com/podcasts/overheard/article/episode-6-trouble-america-captive-tigers-overheard

baby.  Antle was so determined to buy a baby chimpanzee, which by his own admission had to be done in cash so that it was not traceable, that it prompted his original interest in laundering money.

The underbelly of Antle's scheme went beyond the illegal trafficking in animals.  He also promoted his purported conservation efforts through a non-profit of which he was the Director.  This non-profit, Preservation Station Inc., dba The Rare Species Fund, is still prominently displayed through Antle's public-facing persona.  At the same time, behind the scenes, Antle was using the non-profit entity as a clearinghouse to hide illegal payments for animals and was writing checks from the non-profit to buy illegal animals.[28]  An organization that claimed to help save endangered wildlife was, in truth, a tool to traffic the same endangered wildlife.

The scale and length of Antle's conservation façade was extensive.  Long before he rose to fame through the Netflix Documentary "Tiger King," Antle had been buying and selling protected species.  Antle's ability to monetize these animals after their illegal trade has made him extremely wealthy, with the PSR calculating a net worth of more than $22 million.  As recounted in Tiger King, Antle's success inspired others to try to do the same, many of whom are now in prison or have had their facilities shuttered, and all of whom have played a part in promoting the illegal trade in endangered species. Antle's Co-Defendant, Jason Clay, is a prime example.  His explicit intention for buying and selling a baby chimpanzee illegally was to sell photos with the animal, layering illegally and exploitation in an effort to imitate the wealth of Antle.

ii.     Money Laundering Conduct.

Money laundering is a serious offense, and Antle actively engaged in the criminal activity.  The Government expects that Antle will argue, like his Co-Defendant did, that since this was a

---

[28] The Rare Species Fund was prohibited from accepting donations by the State of South Carolina in 2022 and appears to have been dissolved in Florida as well, though the "donation page" is still active on its website.  *See* http://www.rarespeciesfund.org/support.php.

reverse money laundering operation it should not be considered as serious of an offense as "traditional" money laundering. At the outset, reverse money laundering (i.e., laundering proceeds that are represented by law enforcement to be from an unlawful activity) is a crime that is specifically enumerated in 18 U.S.C. § 1956(a)(3) and it is not harmless behavior. In fact, the Fourth Circuit in *United States v. McLamb* has found that the crime of reverse laundering is not harmless. 985 F.2d 1284 (4th Cir. 1993) (finding that reverse money laundering does not unconstitutionally criminalize harmless behavior, and the statute does not permit the courts to second-guess the legislature's determination that the proscribed conduct is harmful).

When charging reverse money laundering, the Government is held to the same beyond a reasonable doubt standard as "traditional" laundering offenses and a defendant charged under § 1956(3) *could* raise any legitimate defense, such as entrapment. *See United States v. Hua Leung*, 787 Fed. Appx. 925 (9th Cir. 2019) (finding that 18 U.S.C. § 1956(a)(1) and 18. U.S.C. § 1956(a)(3) have nearly identical intent requirements). Here, Antle pled guilty to the offense and did not raise an entrapment defense to the operation because the evidence unequivocally established his guilt of the offense. He engaged in multiple meetings with CS1 regarding the laundering of the funds, he knew the represented source of the funds was from illegal activity, he had a predisposition to launder, which would have most likely defeated any entrapment defense and, perhaps most importantly, the evidence has made clear Antle needed cash to help conceal his illegal purchasing of endangered wildlife. Antle willingly and actively engaged with CS1 to launder cash for him and make it look like legitimate construction work was being performed when the check was returned to CS1.

While the details of the offense and the specifics are pieces of evidence a court can consider in weighing what sentence is appropriate, the fact that the proceeds were *represented* by

law enforcement to be illegal does not negate the seriousness of the offense. *See United States v. Oregon*, 58 F.4th 298, 302–03 (7th Cir. 2023) (finding that money laundering was a serious offense even though it arose from a law enforcement operation). Antle's conduct in the laundering operation he is being sentenced for falls squarely within what the money laundering statutes seek to criminalize. Antle should not receive a lesser period of incarceration merely because the funds involved were government-controlled funds. The evidence establishes, to include the lengthy recorded conversations between CS1 and Antle, that Antle believed he was laundering illegally derived proceeds and, further, that he was writing checks to conceal and promote the unlawful activity. As such, a meaningful custodial sentence is appropriate.

**B. Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense, Afford Adequate Deterrence to Criminal Conduct, and Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant – §3553(a)(2)(A)-(C).**

### *Seriousness of the Offense*

Economic crimes and white-collar offenses must be met with sentences commensurate with the seriousness of the crimes themselves. Any sentence less than a significant period of incarceration would promote a lack of respect for the law. Concern that "white-collar offenders … frequently do not receive sentences that reflect the seriousness of their offenses" was among the motivations for the Sentencing Reform Act that gave rise to the United States Sentencing guidelines. S. Rep. No. 98-225 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3260. Among the principal architects of the guidelines was Justice Stephen Breyer, an original member of the Sentencing Commission. He explained that the guidelines required a "short but definite period of confinement" for all but "the least serious cases of these white-collar offenses (level '6' or less)[.]" Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises Upon Which They

Rest, 17 Hofstra L. Rev. 1, 22 (1988). Not only did the applicable guidelines reflect the severity of white-collar offenses, but it also resolved "significant disparities" observed in data gathered by the Commission on how white-collar crimes were treated at sentencing relative to equally-serious non-white-collar offenses in the pre-guideline era. *Id*. at 20.

In Antle's case, we are not in the arena of the least serious cases, and as such, imprisonment is not only called for but required. *See* U.S.S.G § 5C1.1. Antle committed *two* serious offenses, and his conduct warrants a meaningful period of incarceration. As for Antle's wildlife offenses, he used his position of influence and authority within the conservation world to commit his crimes and ensure Myrtle Beach Safari had the exotic animals it needed to make a significant profit. This was not a one-off occurrence. As explained in the PSR, Antle conducted and enabled illegal transactions starting no later than 2016. *See* PSR ¶¶ 42-45. For at least five years, Antle promoted himself as a conservationist while secretly moving illegal money through his "conservation" non-profit, requiring transactions be completed in cash, and ensuring relevant records were falsified in a way that hid his illegal dealings. The amount of money he made influenced countless others to attempt the same, and his schemes continued until the time of his arrest. As for the money laundering offense, Antle did not complete a one-off transaction. Antle discussed laundering at length with CS1, knew the cash he was laundering was from unlawful activity, brought his Co-Defendant Andrew Sawyer into the illegal activity, and, ultimately, assisted CS1 in three separate transactions totaling $505,000.

<u>*Promote Respect for the Law and Provide Just Punishment*</u>

Antle intimately knew the law related to trade in endangered species and a meaningful custodial sentence is necessary to promote respect for the law and provide just punishment. As discussed already throughout this memorandum, Antle knew he needed a non-profit so that sales

could be falsely characterized as "donations," knew that he had to use different addresses so that interstate sales could be falsely characterized as in-state sales, knew which permits would be needed to acquire protected species, and he knew he did not qualify. Antle then used his deep knowledge of the law and its requirements to violate the law so his business could continue to profit. If he wanted to buy out-of-state baby cheetahs, he used cash and falsified paperwork. When he wanted a baby chimpanzee and did not have the $200,000 cash on hand, he was willing to violate money laundering laws to get what he wanted.

Since 2016, Defendant Antle has shown that he has no respect for federal law except for figuring out how to evade it to further his own motives. He was arrested in 2020 for trafficking endangered animals, then he continued conducting illegal transactions without pause. *See* PSR ¶¶ 98-104. He even extended his disrespect to others. In 2019, a federal district court in the Eastern District of Missouri ordered Co-Defendant Sawyer to transfer the chimpanzee "Joey" to a sanctuary. *See Missouri Primate Foundation et al., v People for the Ethical Treatment of Animals, et. al,* No. 4:16-cv-02163, ECF No. 203. Antle was well aware of the Order because he was served notice of it. *Id.* at ECF No. 244. Despite knowing that Sawyer was ordered to transfer Joey to a sanctuary, Antle gave Sawyer a place to hide Joey and provided Sawyer with an alias: "Omar." Eventually a contempt judgement was filed against Sawyer, yet Antle continued to provide "Omar" a place to hide, and Joey was still not transferred to the sanctuary.

Antle broke the law in whichever way he felt benefited him over the course of many years and he made millions of dollars doing so. Thus, a significant custodial sentence is needed to promote respect for the law and provide just punishment for Antle's long history of violating the law.

_Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes_

A sentence of incarceration addresses the deterrence factor, which is so critical in corruption, fraud, and money laundering cases.  Fraud is "'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'"  _United States v. Martin_, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L.Rev. 721, 724 (2005)). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." _Id_.

Here, we have two offenses – economic and wildlife – and Antle was committing the economic offenses to further his buying and selling of animals in violation of the Lacey Act. In a case such as this, where the risk-benefit evaluation involves immense financial gain and enforcement is limited, deterrence is critical.  If Antle can make $200 for a 5-minute photo shoot, or $50,000 - $100,000 for each additional cub he purchases, light punishment is merely the cost of doing lucrative business.  In today's environment, where human interactions with protected species drive social media "likes" and perpetuate the need for, and exploitation of, exotic species,[29] this Court can send a message to Antle and other would-be violators that the risk outweighs the benefits.

While the Government hopes that Antle will cease his criminal conduct, specifically as it relates to the wildlife, it feels strongly that a meaningful period of incarceration is necessary for both specific and general deterrence.

---

[29] _See, e.g._, Natasha Daly, _Helping Kids Deal with Animal Exploitation on Social Media_, National Geographic (May 2021), _https://www.nationalgeographic.com/family/article/helping-kids-deal-with-animal-exploitation-on-social-media;_ Social Media Animal Cruelty Coalition, _Wild Animal "Pets" on Social Media,_ (Nov. 2022), https://www.smccoalition.com/wild-pets-report.

C.     **The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct – §3553(a)(6).**

Congress has directed sentencing courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ." 18 U.S.C. § 3553(a)(6). "[T]he kind of disparity with which § 3553(a)(6) is concerned is an unjustified difference across judges (or districts) rather than among defendants to a single case." *United States v. Pyles*, 482 F.3d 282, 290 (4th Cir. 2007), *vacated on other grounds* by 552 U.S. 1089 (2008) (internal quotation marks omitted). "The Guidelines' goal of national sentencing uniformity is not aimed only at the particular criminal conduct that co-conspirators may share, but also addresses other factors that often vary between co-conspirators like acceptance of responsibility and assistance to the government*." United States v. Withers*, 100 F.3d 1142, 1149 (4th Cir. 1996).

Notwithstanding the Fourth Circuit's noted goal of avoiding unwarranted nationwide disparities, the court has considered disparities among similarly situated Co-Defendants to be valid challenges to procedural reasonableness of a sentence. *See, e.g.*, *United States v. Webb*, 965 F.3d 262, 271 (4th Cir. 2020) (considering defendant's "arguments regarding sentencing disparities with his co-conspirators – an argument drawn directly from the 3553(a) factors" to be a non-frivolous argument district court needed to address); *United States v. Vinson*, 852 F.3d 333, 358 (4th Cir. 2017) (rejecting argument that defendant's sentence resulted in unfair disparity between Co-Defendants under 3553(a)(6) because Co-Defendants pleaded, but defendant went to trial); *United States v. Allmendinger*, 706 F.3d 330, 343 (4th Cir. 2013) ("Indeed, the district court specifically noted that it was considering unwarranted disparities both among defendants in

general and among Co-Defendants within the case.   We therefore conclude that the district court's explanation satisfied the requisite standard.").

Here, there are several other individuals who were charged with Antle and one individual, William Dallis, who was charged in a separate Indictment.[30]  Sentencing Antle to a period of incarceration between 27 and 33 months would not create an *unwarranted* disparity.  At the outset, Antle is not similarly situated to any of his Co-Defendants or the related Defendant William Dallis because he was involved in two distinct categories of criminal activity, environmental crimes and money laundering.[31]

As for Antle's money laundering offense, unlike Dallis, Antle brought another individual, Andrew Sawyer, into the criminal activity and directed him to obtain cashier's checks to give to CS1.  Moreover, Antle's laundering and receipt of cash allowed him to have cash on-hand to purchase illegal animals, which required large sums of cash.  As a result, a period of incarceration more than one year and one day on the laundering offense alone is warranted.

But it is not just the laundering offense that Antle is being sentenced for. Antle also is being sentenced by this Court for his felony environmental crimes. Antle's Co-Defendant, Jason Clay, was recently sentenced to four months' imprisonment followed by four months' home confinement for the sale of one chimpanzee. In contrast, Antle bought three chimpanzees, traded in numerous other endangered species, used a sophisticated manner of hiding his transactions, funneled illegal money through a non-profit entity, generated enormous profits from his activities, directed others

---

[30] As set forth earlier in this memorandum, Dallis was sentenced by this Court to one year and one day.   The Government requested that Dallis receive a two-level variance to make his laundering loss equal, from a guidelines enhancement perspective, to Antle – this was done to address the disparity argument under § 3553(a).

[31] The Government would refer the Court to the PSR, sentencing memorandum, and sealed motions filed for Jason Clay and Andrew Sawyer, which supports the distinction between Antle and these individuals.

to commit crimes on his behalf, and was a major player in the illegal wildlife market. He did all of this while publicly holding himself out as a conservationist and champion of endangered species. There would be no unwarranted disparity with Antle's Co-Defendants if he were sentenced to a period of incarceration between 27 and 33 months.

The Government expects Antle to rely on the various arguments ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ to support a period of incarceration less than one year and one day and, further, to argue a non-custodial sentence is appropriate. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ when weighing all the § 3553(a) factors, to include the disparity factor, it would create a disparity to sentence Antle to a non-custodial sentence. Antle's two serious offenses warrant a meaningful custodial sentence, and a period of incarceration between 27 and 33 months is a warranted disparity.

## IV.      CONCLUSION.

For the reasons stated in this memorandum, the Government believes that a sentence between 27 and 33 months is a sufficient but not greater than necessary sentence to comply with the relevant sentencing factors.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

RESPECTFULLY SUBMITTED,

BRYAN STIRLING
UNITED STATES ATTORNEY


By: /s/ Amy Bower
       Amy F.  Bower (Fed.  Id.  11784)
       Assistant U.S.  Attorney
       151 Meeting Street, Suite 200
       Charleston, South Carolina 29401
       (843) 727-4381
       Amy.Bower@usdoj.gov


ADAM R.F.  GUSTAFSON
ACTING ASSISTANT ATTORNEY GENERAL
ENVIRONMENT AND NATURAL RESOURCES
DIVISION

By: /s/ Patrick Duggan
       Patrick M.  Duggan
       Senior Trial Attorney
       Environmental Crimes Section
       U.S.  Department of Justice
       Tel.: (202) 305-0366
       Patrick.Duggan@usdoj.gov


Charleston, South Carolina
June 24, 2025